203 F.3d 627 (9th Cir. 2000)
 PEARLIE RUCKER; HERMAN WALKER; WILLIE LEE; BARBARA HILL, Plaintiffs-Appellees,
v.
HAROLD DAVIS; OAKLAND HOUSING AUTHORITY, Defendants,
And
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant-Appellant.
PEARLIE RUCKER; HERMAN WALKER; WILLIE LEE; BARBARA HILL, Plaintiffs-Appellees,
v.
HAROLD DAVIS; OAKLAND HOUSING AUTHORITY, Defendants-Appellants,
And
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant.
 No. 98-16322, No. 98-16542
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 12, 1999
Filed February 14, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Howard S. Scher (argued), United States Department of Justice, Washington, D.C.; Carole W. Wilson, Howard M. Schmeltzer, Harold J. Rennett, Office of Litigation and Fair Housing Enforcement, Office of General Counsel, United States Department of Housing and Urban Development, Washington, D.C., for defendant-appellant United States Department of Housing and Urban Development.
 Gary T. Lafayette (argued), Susan T. Kumagai, Lafayette, Kumagai & Clarke, San Francisco, California, for defendantsappellants Oakland Housing Authority and Harold Davis.
 Ira Jacobowitz (argued), Oakland, California; Martin S. Checov, Whitty Somvichian, O'Melveny & Myers, San Francisco, California; John Murcko, Oakland, California; Anne Tamiko Omura, Donna Teshima, Robert Salinas, Oakland, California; William Simpich, Matthew Siegel, Oakland, California, for plaintiffs-appellees Pearlie Rucker, Herman Walker, Willie Lee, and Barbara Hill.
 H. Joseph Escher III, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California, for amicus curiae Center for the Community Interest. Before: Joseph T. Sneed, Diarmuid F. O'Scannlain, and William A. Fletcher, Circuit Judges.
 Appeals from the United States District Court for the Northern District of California, Charles R. Breyer, District Judge, Presiding. D.C. No. CV-98-00781-CRB, D.C. No. CV-98-00781-CRB
 Opinion by Judge O'Scannlain; Dissent by Judge W. Fletcher
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether a local public housing agency may evict a tenant on the basis of drug-related criminal activity engaged in by a household member on or near the premises regardless of whether the tenant was personally aware of such activity.
 
 
 2
 * Established in 1937, the first public housing program was intended to assist states and localities in providing affordable housing to low-income families. See Pub. L. No. 75-412, 50 Stat. 888 (1937). The Housing Act of 1937 vested responsibility for managing, maintaining, and operating public housing developments in local public housing agencies ("PHAs") rather than in the federal government. See 42 U.S.C. S 1437. Over 3,192 local PHAs currently oversee the 1,326,224 public housing units that are home to over 3 million people. See U.S. Dep't of Hous. & Urban Dev., "One Strike and You're Out": Policy in Public Housing 3 (1996); Office of Policy Dev. & Research, U.S. Dep't of Hous. & Urban Dev., A Picture of Subsidized Households, Volume 11, United States: Large Projects & Agencies 14, 72 (1996); Michael H. Schill, Distressed Public Housing: Where Do We Go From Here? , 60 U. Chi. L. Rev. 497, 499-522 (1993). In exchange for monetary assistance for the construction and operation of lowincome housing, local PHAs agree to abide by federal regulations promulgated by the Department of Housing and Urban Development ("HUD") under the United States Housing Act. See generally 42 U.S.C. S 1437 et seq .; see also Hodge v. Department of Hous. & Urban Dev., 862 F.2d 859, 860-61 (11th Cir. 1989) (discussing the relationship between HUD and PHAs); Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 20 (1st Cir. 1991); Thomas v. Chicago Hous. Auth., 919 F. Supp. 1159, 1163 (N.D. Ill. 1996).
 
 
 3
 Intended as a sanctuary for low-income families, see Office of Policy Dev. & Research, supra, at 72 (reporting that public housing residents have an average total household income of $8,500 per year), many public housing projects -primarily the larger ones located in urban areas -have been transformed into havens of crime, with severe and tragic social and physical distress resulting for residents and for the surrounding neighborhoods generally. See U.S. Dep't of Hous. & Urban Dev., supra, at 3; Schill, supra , at 500-01. A White House report states: "Public housing has become a staging area for the distribution of drugs and the violence related to drug trafficking and consumption." Office of Nat'l Drug Control Policy, Executive Office of the President, National Drug Control Strategy 64 (1991); see also D. Saffran, "Public Housing Safety Versus Tenants' Rights," 6 The Responsive Community 34-35 (Fall 1996) (discussing the problem of drugs and crime in public housing).
 
 
 4
 In 1988, Congress took decisive steps towards improving living conditions in public housing, attacking the problem of drugs and crimes, in particular, in the Anti-Drug Abuse Act of 1988. Beginning with the premise that "the Federal Government has a duty to provide public and other federally assisted low-income housing that is decent, safe, and free from illegal drugs," and that "public and other federally assisted low-income housing in many areas suffers from rampant drug-relatedcrime," 42 U.S.C. S 11901(1)-(2),[1] Congress sought to create an effective and efficient mechanism for ridding public housing of those who sell or use drugs. More specifically, Congress required that:
 
 
 5
 Each public housing agency shall utilize leases which--
 
 
 6
 . . . .
 
 
 7
 provide that a public housing tenant, any member of the tenant's household, or a guest or other person under the tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near public housing prem ises, while the tenant is a tenant in public housing, and such criminal activity shall be cause for termina tion of tenancy.
 
 
 8
 42 U.S.C. S 1437d(l)(5) (1989).[2] In 1990 and in 1996, Congress altered the language of the statute, but left its effect unchanged in relevant part:
 
 
 9
 Each public housing agency shall utilize leases which--
 
 
 10
 . . .
 
 
 11
 provide that any criminal activity that threat ens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termi nation of tenancy . . . .
 
 
 12
 Id. S 1437d(l)(5) (1991). Congress amended this statute further in 1996, replacing the phrase "on or near such premises" with "on or off such premises." Id. (1997).[3]
 
 
 13
 In 1991, HUD issued regulations implementing section 1437d(l)(5). One such regulation, 24 C.F.R. S 966.4 (f)(12)(i)(B), provides:
 
 
 14
 S 966.4 Lease requirements.
 
 
 15
 A lease shall be entered into between the PHA and each tenant of a dwelling unit which shall contain the provisions described hereinafter.
 
 
 16
 . . .
 
 
 17
 (f) Tenant's obligations. The lease shall provide that the tenant shall be obligated:
 
 
 18
 . . .
 
 
 19
 (12)(i) To assure that the tenant, any member of the household, a guest, or another person under the tenant's control, shall not engage in:
 
 
 20
 . . .
 
 
 21
 (B) Any drug-related criminal activity on or near such premises.
 
 
 22
 Any criminal activity in violation of the preceding sentence shall be cause for termination of tenancy, and for eviction from the unit.
 
 
 23
 24 C.F.R. S 966.4(f)(12)(i)(B). Another regulation similarly provides:
 
 
 24
 Either of the following types of criminal activity by the tenant, any memberof the household, a guest, or another person under the tenant's control, shall be cause for termination of tenancy:
 
 
 25
 . . .
 
 
 26
 (B) Any drug-related criminal activity on or near such premises.
 
 
 27
 Id. S 966.4(l)(2)(ii)(B).
 
 
 28
 In formulating these regulations, HUD considered comment by legal aid and by tenant organizations that tenants "should not be required to `assure' the non-criminal conduct of household members, or should have only a limited responsibility to prevent criminal behavior by members of the household" and "that the tenant should not be responsible if the criminal activity is beyond the tenant's control, if the tenant did not know or have reason to foresee the criminal conduct, if the tenant did not participate, give consent or approve the criminal activity, or if the tenant did everything `reasonable' to control the criminal activity." 56 Fed. Reg. 51560, 51566 (Oct. 11, 1991). Ultimately, however, HUD decided not to accept these suggestions, instead choosing to grant local PHAs the discretion to evict a tenant whose household members or guests use or sell drugs on or near the public housing premises regardless of whether the tenant knew or should have known of such activity. See id. at 51566-67. HUD stated quite explicitly: "The tenant should not be excused from contractual responsibility by arguing that tenant did not know, could not foresee, or could not control behavior by other occupants of the unit." Id. at 51567.
 
 
 29
 HUD offered several reasons for its decision. First, the "contractual responsibility of the tenant for acts of unit occupants is a conventional incident of tenant responsibility under normal landlord-tenant law and practice, and is a valuable tool for management of the housing. The tenant should not be excused from contractual responsibility by arguing that tenant did not know, could not foresee, or could not control behavior by other occupants of the unit." Id. at 51567. Second, HUD feared that allowing a tenant to escape eviction by claiming a lack of knowledge "would allow a variety of excuses for a tenant's failure to prevent criminal activity by household members" and "would thereby undercut the tenant's motivation to prevent criminal activity by household members." Id. Third, PHAs may often have difficulty proving in court that the leaseholder had knowledge or control over the offending person, thus making it time-consuming, costly, and otherwise cumbersome to evict households causing drug-related problems in public housing. See id. Finally, HUD noted that "a family which does not or cannot control drug crime, or other criminal activities by a household member which threaten health or safety of other residents, is a threat to other residents and the project." Id.
 
 
 30
 Importantly to this case, although HUD unequivocally authorizes eviction whenever a household member or guest sells or uses drugs on or near the apartment premises, it does not mandate or even encourage across-the-board evictions whenever there is cause to evict. Instead, its regulations recognize the importance of giving each case individualized consideration in light of the equities of the tenant's particular situation and examining whether some remedial measure other than eviction of the tenant may be appropriate even when there is clearly cause to evict the tenant. See infra Part IV-C; 24 C.F.R. S 966.4(l)(5)(i).
 
 II
 
 31
 Pursuant to section 1437d(l)(5) and HUD regulations, the Oakland Housing Authority ("OHA") includes in its leases a provision obligating tenants to "assure that tenant, any member of the household, or another person under the tenant's control, shall not engage in . . . [a]ny drug-related criminal activity on or near the premises (e.g., manufacture, sale, distribution, use, possession of illegal drugs or drug paraphernalia, etc.)." It is this lease provision -which OHA interprets as authorizingthe eviction of a tenant on the basis of a household member's or guest's drug-related criminal activity regardless of whether the tenant knew or reasonably should have known of such activity -that has given rise to the present controversy.
 
 
 32
 OHA commenced separate unlawful detainer actions in the Alameda County Municipal Court against Pearlie Rucker, Willie Lee, Barbara Hill, and Herman Walker (collectively "Tenants") after discovering a household member or guest of each Tenant engaging in drug-related criminal activity on or near the public housing premises. The relevant facts regarding the first three Tenants are quite similar. Rucker's daughter was found in possession of cocaine and drug paraphernalia three blocks from Rucker's apartment. Lee's grandson was caught using marijuana in the housing development's parking lot, as was Hill's grandson. All three Tenants claim to have been unaware of their household member's drug-related criminal activity.
 
 
 33
 The fourth Tenant, Walker, presents a somewhat different case. Walker is partially paralyzed and incapable of living independently. OHA served him with a notice of termination of tenancy after the third instance in which drugs or drug paraphernalia were found in his apartment. On the first occasion, officers found cocaine chips and cocaine pipes in Walker's bedroom as well as a cocaine pipe in the jacket of Eleanor Randle, Walker's care-giver.[4] Randle was arrested for possession of narcotics paraphernalia, and OHA issued Walker a lease violation notice. OHA officers and the housing manager conducted a follow-up check of Walker's apartment five days later and found another rock cocaine pipe, at which point Walker was issued another lease violation notice. Two months later, drug paraphernalia was found in Walker's apartment yet again. In addition to issuing a third lease violation notice, OHA served Walker with a notice of termination and initiated an unlawful detainer action after he refused to vacate. It was not until after Walker received his third lease violation notice that he fired his drug-using care-giver.
 
 
 34
 In response to OHA's unlawful detainer actions, Tenants filed the present action in the United States District Court for the District of Northern California against HUD, OHA, and OHA's director Harold Davis in December 1997. Tenants argued that 42 U.S.C. S 1437d(l)(5) does not authorize the eviction of what they termed an "innocent tenant " -namely, a tenant who did not know of and had no reason to know of a household member's or guest's drug dealing or drug use. Tenants argued further that, if it does, the statute is unconstitutional. In addition, Walker alleged that his eviction would violate Title II of the Americans with Disabilities Act ("ADA"). See 42 U.S.C. S 12132, et seq.[5]
 
 
 35
 Tenants sought a preliminary injunction against their eviction, and the parties agreed to stay Lee's, Hill's, and Walker's state court proceedings pending the resolution of the present case.[6] "To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist., 868 F.2d 1085, 1088 (9th Cir. 1989). The district court concluded that Tenants had established a "fair chance of success" on their claim that HUD's interpretation of section 1437d(l)(5) was inconsistent with the statute itself and thus violated the Administrative ProcedureAct ("APA"), see 5 U.S.C.SS 701-706. The court determined further that HUD's interpretation raised substantial concerns with respect to Tenants' First Amendment right to freedom of association. Finding that the balance of hardships tipped decisively in Tenants' favor, the district court preliminarily enjoined the eviction of any public housing tenant for "drug-related criminal activity that does not occur within the tenant's apartment unit when the tenant did not know of, or have reason to know of, the drug-related criminal activity."[7] HUD, OHA, and Davis appeal this injunction.
 
 
 36
 In addition, the district court held that Walker had established a fair chance of success on his ADA claim, reasoning that, because Walker's disability prevents him from living without a care-giver, he is at greater risk for termination of tenancy than tenants who do not require in-home care. Finding that the balance of hardships weighed in Walker's favor, the court enjoined OHA from evicting Walker on the basis of his care-giver's drug-related criminal activities. OHA and Davis appeal this ruling.
 
 III
 
 37
 Before turning to the merits, a word on the standard of review is in order. We review the district court's grant of preliminary injunctive relief for an abuse of discretion. See Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1045-46 (9th Cir. 1999). Because a district court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law, however, we review the legal issues underlying a preliminary injunction de novo and may rule on the merits of the controversy if legal issues are dispositive. See, e.g., id. at 1046 (citing cases); Foti v. City of Menlo Park, 146 F.3d 629, 634-35 (9th Cir. 1998); Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir. 1996); see also Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 757 (1986), overruled in part on other grounds by Planned Parenthood v. Casey, 505 U.S. 833 (1992); Planned Parenthood v. Camblos, 155 F.3d 352, 35960 (4th Cir. 1998), cert. denied, 119 S. Ct. 1031 (1999).
 
 IV
 
 38
 The first question before us is whether HUD in its applicable regulations has adopted a permissible interpretation of 42 U.S.C. S 1437d(l)(5), or, more precisely, whether HUD's interpretation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A). The parties agree that we resolve this issue by applying the familiar framework set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Chevron instructs us to begin our analysis by determining whether "Congress has directly spoken to the precise question at issue." Id. at 842-43. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. If, and only if, the language is silent or ambiguous on the precise question at hand do we proceed to step two, which is to defer to the agency unless its interpretation is arbitrary or capricious. See id. at 842-43 & n.9; see also Young v. Community Nutrition Inst., 476 U.S. 974, 981 (1986) ("This view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that [the agency] might haveadopted but only that [the agency's] understanding of this very `complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]." (internal quotation marks and citation omitted)); Jang v. Reno, 113 F.3d 1074, 1076 (9th Cir. 1997).
 
 
 39
 HUD argues that section 1437d(l)(5) and the broader statutory context evince a clear congressional intent authorizing the eviction of any tenant whose household member or guest engages in drug-related criminal activity on or near the public housing premises even if the tenant did not know of such activity. Tenants maintain that the unambiguously expressed intent of Congress is to the contrary. The district court disagreed with both and instead concluded that the public housing lease statute is silent with respect to the issue before us.
 
 
 40
 In adjudicating among these conflicting views, we look to traditional tools of statutory construction for guidance. See Chevron, 467 U.S. at 843 n.9. More specifically,"[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).
 
 
 41
 * We begin, as we must, with the express language of the statute. "Where there is no ambiguity in the words, there is no room for construction." United States v. Gonzales, 520 U.S. 1, 8 (1997) (quoting United States v. Wiltberger , 18 U.S. (5 Wheat.) 76, 95-96 (1820)). Section 1437d(l)(5), as amended, provides that "any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." 42 U.S.C. S 1437d(l)(5). The plain statutory language thus makes clear that Congress intended that there be cause for termination of tenancy when three conditions are met: there is (1) drug-related criminal activity, (2) on or off the public housing premises, (3) engaged in by the tenant, any household member, or any guest or other person under the tenant's control.
 
 
 42
 That each of Tenants' cases involved drug-related criminal activity as defined in section 1437d is not contested; similarly undisputed is the fact that the conduct in question occurred on or near the public housing premises . The only real dispute concerns the third prong -whether the activity was engaged in by "a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control." Id.
 
 
 43
 Focusing on the statutory term "control," Tenants argue that cause for termination exists only if the tenant could realistically exercise "control" over the drug-dealing or drugusing household member or guest. Where, for example, a teenage son rarely heeds his mother's instructions and is generally uncontrollable, Tenants contend that OHA lacks authority to evict the entire household on the basis of the son's conduct -even if he is selling drugs out of the apartment -because the mother does not have "control" over her son.
 
 
 44
 Applying basic principles of grammar, we conclude that this construction of the public housing lease statute is untenable. The clause at issue -"public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" -includes three separate categories of people: (1) the tenant, (2) any household member, and (3) any guest or other person under the tenant's control. The phrase "under the tenant's control" has no relationship whatsoever to either of the first two categories -tenant or household member.
 
 
 45
 With respect to the third category, implicit in the phrase "any guest or otherperson under the tenant's control" is that guests are per se under the tenant's control. "Control" is a legal concept; tenants have control over their guests. Just as a tenant cannot escape liability for damage to a neighbor's apartment caused by a drunken guest by arguing that the guest was drunk and thus out of control, a tenant cannot avoid the import of section 1437d(l)(5) by arguing that, because his guests are stronger than he, he could not physically prevent them from selling drugs in his apartment. See, e.g., Housing Auth. v. Green, 657 So. 2d 552, 554 (La. Ct. App. 1995) ("[W]here . . . the lease refers to `a guest or other person under the tenant's control' it means that the tenant`controls' who has access to the premises. The lease makes the tenant responsible for the drug activities of those persons given access to the apartment by the tenant. `Control' as used in the lease in no way implies that the tenant knew or should have known of the drug activity . . . .").
 
 
 46
 Because the conduct for which OHA is attempting to evict Tenants unquestionably was committed by a household member or a guest, we conclude that the third, and final, prong of section 1437d(l)(5) is satisfied as well. Accordingly, the plain statutory language authorizes the termination of Tenants' tenancy. More generally, the express statutory language -which, to repeat, provides that "[(1)] any drug-related criminal activity [(2)] on or off such premises, [(3)] engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" is cause for eviction -evinces a clear congressional intent to authorize termination of tenancy regardless of whether the tenant was aware that his household member or guest was selling, manufacturing, distributing, or using drugs. Thus, the statute makes clear that even purportedly "innocent tenants" may be evicted.[8]
 
 B
 
 47
 Notwithstanding the fact that the statute makes any drugrelated criminal activity by a household member or guest cause for termination of tenancy, the district court concluded that section 1437d(l)(5) is silent as to whether Congress intended to authorize the eviction of "innocent tenants" because it fails to address explicitly the situation of "innocent tenants." In the district court's view, a statute contains a clearly expressed congressional intent on an issue only if it explicitly addresses that issue. The district court appears to have placed great emphasis on the fact that Congress could have provided, for example, that "any drug-related criminal activity by a household member or guest including that of which the tenant is unaware" or "any drug-related criminal activity by a household member or guest regardless of the tenant's knowledge thereof" is cause for eviction.
 
 
 48
 The district court's failure to appreciate the implications of Congress's use of the term "any" when it made "any drugrelated criminal activity [by a tenant, household member, or guest] . . . cause for termination" does violence to the plain language rule. 42 U.S.C. S 1437d(l)(5) (emphasis added). A statute covering "any drug-related criminal activity" has the exact scope as one covering "any drug-related criminal activity including that of which the tenant is unaware" or "any drug-related criminal activity regardless of the tenant's knowledge thereof." These italicized hypothetical clauses are mere surplusage -they add nothing of substance. Just as section 1437d(l)(5) covers drug-related criminal activity on weekends even though the statute does not explicitly refer to "any drug-related criminal activity including that which occurs on weekends," the statute covers conduct that the tenant does not know of even though it does not explicitly refer to "any drug-related criminal activity including that of which the tenant is unaware." The hypothetical "including" clauses merely enumerate subsets of cases already covered by the statute as actually written.
 
 
 49
 We have no reason to think that Congress meant anything other than "any" when it used the term "any." "Read naturally, the word `any' has an expansive meaning, that is, `one of some indiscriminately of whatever kind.' " United States v. Gonzales, 520 U.S. 1, 4 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). We suppose that Congress could have included an additional sentence stating "Yes, we really do mean `any.' " Even without such a statement, binding precedent instructs that, just as "no " means "no," "any" really does mean "any."[9]
 
 
 50
 Tenants marshal policy arguments why we should restrict the scope of "any." Even if were we to agree, we cannot avoid the fact that Tenants' interpretation contradicts the express statutory language. We can limit section 1437d(l)(5)'s scope as Tenants request only by reading into the statute words that Congress did not see fit to include. This we refuse to do. Indeed, we may not so alter the statute's effect. As judges, we are interpreters, not authors, of the law.
 
 C
 
 51
 Notwithstanding the expansiveness of the statutory language, Tenants strenuously attack the propriety of evicting "innocent tenants" and claim that a monumental injustice will result from the wholesale eviction of any and all tenants who have a household member or guest who uses drugs. What Tenants either fail to recognize -or attempt to obscure -is that the question of whether there is cause to evict is wholly separate from whether the PHA will actually evict. Section 1437d(l)(5) merely requires that local PHAs make drugrelated criminal activity "cause for termination of tenancy." 42 U.S.C. S 1437d(l)(5). Where there is cause for termination, a PHA may evict, but it is not required to evict in all instances in which there is cause to do so.
 
 
 52
 The public housing lease statute, although it authorizes eviction in a broad range of cases, is notably silent as to when termination of tenancy is required. By structuring the statute in this way, Congress implicitly conveyed discretion to HUD and to PHAs to make termination decisions in individual cases. This discretion is consistent with the Housing Act's long-established statement that "[i]t is the policy of the United States . . . to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public." Id. S 1437(a)(1)(C); see also Newbury Local Sch. Dist. Bd. of Educ. v.Geauga County Metro. Hous. Auth., 732 F.2d 505, 509 (6th Cir. 1984) (noting that the Housing Act is "structured to place the `maximum amount of responsibility' of administration on the local public housing agencies"); Gholston v. Housing Auth., 818 F.2d 776, 781 (11th Cir. 1987) ("[T]he Housing Act gives local housing authorities discretion to . . . manage the day-to-day affairs of the subsidized housing projects.").[10]
 
 
 53
 Leaving individual eviction decisions to HUD and local PHAs makes much sense. Eviction is a drastic remedy, and individualized consideration of the equities in a particular tenant's case is appropriate. Difficult cases will inevitably arise. It would be exceedingly difficult to enumerate a priori which tenants should be evicted, and Congress did not attempt to do so. With respect to "innocent tenants," for example, some tenants are more "innocent" than others. Should a tenant whose son deals drugs at the public housing development unbeknownst to the tenant be evicted? What about a tenant whose grandson uses drugs in the parking lot unbeknownst to her?
 
 
 54
 These are difficult policy questions. We see arguments on both sides, but how we judges might weigh competing policy considerations is simply irrelevant. Congress entrusted these questions to HUD and to individual PHAs, not to the federal judiciary. Congress charged HUD, the agency generally responsible for regulating and overseeing public housing, with formulating general principles to guide eviction determinations; it assigned local PHAs the responsibility for deciding how to proceed in individual cases.
 
 
 55
 HUD has provided some general guidance for dealing with individual cases, but largely leaves eviction decisions to PHAs. Of particular relevance to the case at hand is 24 C.F.R. S 966.4(l)(5)(i):
 
 
 56
 (5) Eviction for criminal activity--(i) PHA dis cretion to consider circumstances. In deciding to evict for criminal activity, the PHA shall have dis cretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by family members, and the effects that the eviction would have on family mem bers not involved in the proscribed activity. In appropriate cases, the PHA may permit continued occupancy by remaining family members and may impose a condition that family members who engaged in the proscribed activity will not reside in the unit. A PHA may require a family member who has engaged in the illegal use of drugs to present evi dence of successful completion of a treatment pro gram as a condition to being allowed to reside in the unit.
 
 
 57
 24 C.F.R. S 966.4(l)(5)(i). Quite sensibly, HUD does not advocate the eviction of all "innocent tenants, " but instead counsels PHAs to handle cases on an individualized basis and to consider alternative remedies. This policy is further embodied in a HUD publication entitled "One Strike and You're Out": Policy in Public Housing:
 
 
 58
 The lease language mandated by federal law imposes on tenants an affirmative obligation to assure that neither they nor any member of their household or guest or other person under their con trol will engage in prohibited drug-related or other criminal activities. PHAs can generally enforce this obligation by terminating leases and evicting entire households when a household member or guest com mits a crime in violation of lease provisions. A promise is a promise. Where the tenant has promised in a lease to ensure a crime-free household, the ten ant is responsible for the household, regardless of whether he or she was personally engaged in the pro hibited drug or other criminal activity.
 
 
 59
 PHAs retain the flexibility to handle these cases on an individualized basis, and they should exercise reasonable discretion in light of all of the relevant circumstances. In particular, when a tenant has taken all reasonable steps to prevent the criminal activity, eviction may not always be warranted or proper. To ensure both humane results and success in court, PHAs should undertake a case-by-case analysis before proceeding with eviction. If they do seek eviction, PHAs should be prepared to persuade a court that eviction is justified.
 
 
 60
 In some instances, eviction of an entire household may not be appropriate as a means of protecting the health, safety and welfare of the public housing com munity. In others, alternative approaches may be appropriate, such as allowing a household to remain in occupancy on the condition that the offending member move and agree not to return. This latter approach does not always lead to effective long-term removal of the offending individual. PHAs, there fore, should consider the likelihood of success in each particular case and their ability under local law to take action if an agreement is violated. In some cases, trespass laws and restraining orders may also help to keep former residents away from remaining household members.
 
 
 61
 Office of Policy Dev. & Research, U.S. Dep't of Hous. & Urb. Dev., supra, at 8.[11]
 
 
 62
 Leaving PHAs with discretion is sensible in light of the fact that local PHAs, being most closely associated with the tenants themselves and having the most knowledge about the local situation, are best situated to give individualized consideration to each case. See 42 U.S.C. S 1437(a)(1)(C); see also Gholston, 818 F.2d at 781 ("The administration of local housing authorities is a difficult task . . . . Consequently, the scope of judicial review of a local housing authority's policies and practices is limited, and we will not view its actions as a violation of the Housing Act or HUD regulations unless it abused its discretion." (citations omitted)).
 
 D
 
 63
 Our conclusion that section 1437d(l)(5) authorizes termination of tenancy regardless of the tenant's knowledge of the drug-related criminal activity is reinforced by two related statutory provisions.
 
 
 64
 * First, 42 U.S.C. S 1437d(c)(4)(A)(iii), which was in effect through 1996, prohibited any individual or family who was evicted because of a household member's or guest's drugrelated criminal activity from receiving a statutory preference in applying for public housing, but exempted from this threeyear prohibition period any member of a family of an individual who "the agency determines clearly did not participate in and had no knowledge of" the activity that formed the basis of the original eviction. 42 U.S.C. S 1437d(c)(4)(A)(iii).[12] If an "innocent tenant"could not have been evicted in the first place, there would have been no need for Congress to write a statute specifically waiving the three-year prohibition period for them. Adhering to the well-established "principle that statutes should not be construed to make surplusage of any provision," Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 834 (9th Cir. 1996), we must interpret section 1437d(l)(5) as authorizing the eviction of "innocent tenants." This is especially so in light of the fact that Congress enacted the three-year prohibition period of section 1437d (c)(4)(A)(iii) in 1990, the same year it made amendments to section 1437d(l)(5).[13]
 
 2
 
 65
 The second statute that lends credence to our interpretation of the public housing lease statute is a civil forfeiture statute which, inter alia, makes leasehold interests subject to forfeiture when used to commit drug-related criminal activities. See 21 U.S.C. S 881(a)(7).[14] In sharp contrast to section 1437d(l)(5), this civil forfeiture statute includes an explicit exception for "innocent tenants": "no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of the owner." Id. (emphasis added). This civil forfeiture provision makes abundantly clear that Congress knows how to legislate an "innocent tenants " exception. The absence of similar language in section 1437d(l)(5) indicates that Congress did not intend to create such an exception with respect to public housing evictions.[15]
 
 
 66
 Tenants interpret section 881(a)(7) quite differently. They argue, for the first time in supplemental briefing filed after oral argument, that Congress understood the "innocent tenant" exception of section 881(a)(7) to be a constitutionally mandated requirement such that it must have wanted to incorporate the same exception into the public housing lease statute. We find this reasoning unpersuasive. That there may be a constitutional bar to forfeiture of property when the property owner is uninvolved and unaware of the wrongful activity that formed the cause for forfeiture, see Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974), does not mean that there is a similar bar in the distinct context of eviction proceedings.
 
 
 67
 The statute governing civil forfeitures differs in many respects from the public housing lease statute. First, forfeiture under section 881(a)(7) involves the transfer of private property to the federal government,[16] which raises concerns of misdirected incentives. See Bennis v. Michigan , 516 U.S. 442, 456 (1995) (Thomas, J., concurring) (noting that if abused, "forfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners"); United States v. James Daniel Good Real Property, 510 U.S. 43, 8182 (1993) (Thomas, J., concurring in part and dissenting in part); Michele M. Jochner, Illinois Bar Journal , 87 Ill. B.J. 78, 79 (1999) ("[T]he relative ease with which the government can seize and forfeit property, when measured against the disproportionately punitive nature of some forfeitures, has caused concern that the considerable revenue added by the forfeited assets to the government's coffers may spur overzealous prosecution." (footnote omitted)). The concerns raised by allowing the federal government to fill its coffers through seizures of property for minor offenses, see United States v. Bajakajian, 524 U.S. 321, 118 S. Ct. 2028, 2032 (1998) (government seized $357,144 in cash that Bajakajian attempted to leave the country with without complying with federal reporting requirements); Calero-Toledo, 416 U.S. at 668 n.4, 693 ($20,000 yacht forfeited based upon the discovery of one marijuana cigarette), simply do not arise under section 1437d(l)(5), since PHAs do not reap a financial windfall when they evict tenants.
 
 
 68
 Second, to seize property under the forfeiture provision, the federal overnment need only show probable cause that the property was used for prohibited purposes, with the burden then shifting to the leaseholder to establish, by a preponderance of the evidence, lack of knowledge or consent. See United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres, 904 F.2d 487, 490 (9th Cir. 1990). Probable cause is, of course, a lower standard of proof than the preponderance of evidence test typically required in civil proceedings. See United States v. All Right, Title & Interest in Real Property & Bldg. Known as 303 West 116th Street, New York, New York, 901 F.2d 288, 291 (2d Cir. 1990); United States v. One 56-Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1281 (9th Cir. 1983). Third, summary seizure procedures are available to the federal government in forfeiture cases. See 21 U.S.C. S 881(b). The ability to seize a leaseholder's property using such procedures -without proof that it is more likely than not that the resident engaged in, or permitted, drugrelated criminal activity -is an awesome power, which both Congress and the Supreme Courthave seen fit to rein in. See id. S 881(a)(7) (incorporating "innocent tenant" exception and allowing seizure of property only where the drug offense is punishable by more than one year imprisonment); Bajakajian, 118 S. Ct. at 2031 (holding that forfeitures may violate the Eighth Amendment Excessive Fines Clause).[17]
 
 
 69
 Congress sensibly limited forfeiture to the more reprehensible violations of our drug laws -specifically, drug offenses punishable by more than one year and committed with the knowledge or consent of the leaseholder. See 21 U.S.C. S 881(a)(7). Congress did not see the need to limit eviction by PHAs in a similar fashion. Thus, the "innocent tenants" exception contained in section 881(a)(7) applies only to that section, and not to section 1437d(l)(5).[18]
 
 E
 
 70
 Tenants rely heavily on another related statutory provision, 42 U.S.C. S 1437d(l)(1), which prohibits PHAs from including "unreasonable terms and conditions" in their leases. 42 U.S.C. S 1437d(l)(1).[19] Tenants argue that there is no sensible reason for evicting a tenant who does not know of a household member's or guest's drug-related criminal activity and thus that any lease provision authorizing the eviction of an "innocent tenant" violates section 1437d(l)(1)'s reasonableness requirement. We cannot agree.
 
 
 71
 As an initial matter, Tenants' argument contravenes the canon of statutory interpretation that a general statutory provision typically cannot be used to trump a specific provision. See Green v. Bock Laundry Mach. Co., 490 U.S. 504, 524-26 (1989); Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, 444-45 (1987). "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) (quoting Morton v. Mancari, 417 U.S. 535, 550-51 (1974)).
 
 
 72
 Moreover, crime in public housing -much of which finds its roots in drugs[20] -is a severe problem. Authorizing the eviction of households with drug-dealing and drug-using members is a reasonable step towards achieving Congress's self-declared "duty to provide public housing that is decent, safe, and free from illegal drugs." Id. S 11901. By making a household member's or guest's drug-related criminal activity grounds for the tenant's eviction, Congress created a strong incentive for public housing tenants to refrain from inviting drug dealers and drug users to theirpremises and to ensure that household members and guests do not sell, manufacture, distribute, use, or possess controlled substances. See 56 Fed. Reg. 51560, 51566-67. Congress was reasonably concerned with preventing tenants from turning a blind eye to the conduct of a household member or guest.
 
 
 73
 Requiring PHAs to prove that a tenant knew or reasonably should have known of a household member's or guests's drug-related criminal activities in order to evict would hamstring their efforts to rid public housing of the crime and violence with which low-income families must cope on a daily basis. See id. Congress could reasonably have decided not to create an "innocent tenant" exception to avoid transforming efficient unlawful detainer actions into fact-based and potentially costly and lengthy legal cases. At present, a PHA can evict a tenant simply by showing that the tenant, a member of his household, or his guest used, sold, distributed, manufactured, or possessed a controlled substance on or near the public housing premises. Such proof is relatively easy to obtain, since a PHA can offer arrest or conviction records to prove the drug-related criminal activity, leaving little room for factual disputes. Significant delays would ensue if PHAs were required to expend time and effort litigating what the tenant actually knew or what he should have known. These are inherently factual issues which will often boil down to credibility determinations, the resolution of which will almost always require an actual trial.[21] PHAs might well agree that, the faster a drug-dealing or drug-using household is evicted, the better. Moreover, it may often be difficult to secure admissible proof of what the tenant knew or should have known. Even if everyone in the apartment building knows who the drug dealers and drug users are, few, if any, may be willing to testify in court -or even to go on the record -against a tenant with gun-toting, drug-dealing household members or friends. Witness intimidation is a very real problem. See 18 U.S.C. S 1512.
 
 
 74
 The decision not to include an "innocent tenant " exception also reasonably helps to keep down litigation costs. It is all too easy to belittle this problem, but we must remember that PHAs already lack adequate funding. OHA, for example, stated before the district court that it does not even have enough funds to maintain a full-time security staff at each of its housing developments. Forcing OHA and other PHAs to utilize more of their already scarce funds in litigation will deprive them of money needed to fund other important activities such as security. To avoid this result is eminently reasonable. See Phillips Neighborhood Hous. Trust v. Brown, 564 N.W.2d 573, 575 (Minn. Ct. App. 1997) ("[T]here is a strong public policy interest in eliminating drugs from subsidized housing. Evicting those who violate the lease by having controlled substances in their apartments is [the landlord's] most effective, if not its only effective, means of eliminating drugs and providing a safe environment.").
 
 
 75
 The reasonableness of making drug use by household members and guests a ground for eviction from public housing is supported by the fact that leases for privately-owned housing often hold tenants liable for the activities of their household members and guests. The "contractual responsibility of the tenant for acts of unit occupants is a conventional incident of tenant responsibility under normal landlord-tenant law and practice, and is a valuable tool for management of the housing." 56 Fed. Reg. 51560, 51566 (Oct. 11, 1991). Thus, a private tenant can often be evicted if his children or other household members cause significant damage to property, harass neighbors, or engage in illegal activities. The fact that private landlords include these provisions in their leases even though they are not obligated by law to do so shows that it is sensible to make a third party's drug activities cause for termination of tenancy.[22]
 
 
 76
 We note that "no fault" liability is routinely imposed in related contexts. For example, many states hold parents vicariously liable for the intentional torts of their children regardless of whether the parents knew, or should have known, that their children would cause bodily injury or property damage. See, e.g., Conn. Gen. Stat. S 52-572; Kan. Stat. Ann. S 38120; Or. Rev. Stat. S 30.765(1). The rationale underlying making "innocent parents" liable for their children's actions -to encourage parents to oversee the behavior of their children -is essentially the same as that underlying Congress's decision to impose a "no-fault" eviction policy -to encourage tenants to monitor the conduct of their household members and guests. Just as states reasonably impose liability even on "innocent parents," Congress reasonably may authorize the eviction of "innocent tenants." Such "no fault" liability is not limited to parent-child cases. In the environmental context, a property owner can be held liable for the costs of cleaning up waste on his property even if the waste was legally deposited by a previous property owner. See 42 U.S.C.S 9607. Thus, even an "innocent property owner" can be subjected to substantial liability under the Superfund laws.
 
 
 77
 Any conclusion to the contrary is squarely foreclosed by the recent enactment of 42 U.S.C. S 13662(a)(1), which provides:
 
 
 78
 Notwithstanding any other provision of law, a public housing agency or an owner of federally assisted housing (as applicable), shall establish standards or lease provisions for continued assistance or occu pancy in federally assisted housing that allow the agency . . . to terminate the tenancy or assistance for any household with a member--
 
 
 79
 (1) who the public housing agency or owner determines is illegally using a controlled substance . . . .
 
 
 80
 42 U.S.C. S 13662(a) (emphases added). Congress, in passing this statute expressly allowing the eviction of any household with a drug-using member, declared its view that it is reasonable to evict a tenant on the basis of another's crimes. Unless we are so bold as to say that a policy decision reflected in legislation enacted with the votes of 409 Representatives and 96 Senators is not rationally related to a legitimate housing purpose, we must conclude that HUD's interpretation of section 1437d(l)(5) is indeed reasonable.[23] Keeping in mind that PHAs have discretion in deciding whether to evict in individual cases, we hold that it is not unreasonable for Congress to obligate all public housing tenants to ensure that their household members and guests refrain from engaging in drugrelated criminal activities or other activities that threaten the health or safety of other public housing tenants.[24]
 
 F
 
 81
 Although both parties present arguments based upon the legislative history, we conclude that there is no need to examine it in the present case. Where, as here, the language of the statute is plain and unambiguous, resort to legislative history is unnecessary. See United States v. Gonzales , 520 U.S. 1, 6 (1997); City of Auburn v. United States, 154 F.3d 1025, 1030 (9th Cir. 1998) ("[W]here statutory command is straightforward, `there is no reason to resort to legislative history.' " (citation omitted)), cert. denied, 119 S. Ct. 2367, 144 L.Ed.2d 771 (U.S. June 21, 1999). We have warned that: "Reliance on such history is particularly suspect when it is inconsistent with the ordinary understanding of the words in the statute and an otherwise reasonable agency interpretation. " Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1070 (9th Cir. 1998); see also id. ("[T]he use of legislative history as a tool for statutory interpretation suffers from a host of infirmities: not only is legislative history `not passed by both houses of Congress and signed into law by the President,' but it also `need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language.' " (citations omitted)).
 
 
 82
 In any event, even if we were to resort to it here, the relevant legislative history is ambiguous. Both HUD and Tenants focus on the following statement by the Senate Banking, Housing and Urban Affairs Committee ("Committee"):
 
 
 83
 The Committee anticipates that each case will be judged on its individual merits and will require the wise exercise of humane judgment by the PHA and the eviction court. For example, eviction would not be the appropriate course if the tenant had no knowl edge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity.
 
 
 84
 S. Rep. No. 101-316, at 179 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5941. Tenants contend that the Committee's statement that "eviction would not be the appropriate course" indicates that section 1437d(l)(5) does not authorize the eviction of tenants with no knowledge of the drug-related criminal activities. HUD, focusing on a different part of the same passage, emphasizes that the Committee explicitly entrusted individual eviction decisions to the "wise exercise of humane judgment" of the local PHA, reasoning that, had Congress not intended to give PHAs discretion to evict tenants with no knowledge of the drug-related criminal activity, it would not have talked about the exercise of "humane judgment" by PHAs since there would be no "judgment" to exercise. Whether the legislative history bolsters HUD's position or Tenants' is unclear. There are strong arguments on both sides. To the extent that legislative history is ever helpful, it is not of value in the present case.
 
 V
 
 85
 Having concluded that the plain language of 42 U.S.C. S 1437d(l)(5), considered both by itself and in light of the broader statutory context, makes any drug-related criminal activity engaged in by a tenant, household member, or guest cause for termination regardless of whether the tenant knew of such activity, we must decide whether this statute is consistent with the United States Constitution. Tenants maintain that the public housing lease provision violates their Fourteenth Amendment right to intimate association as well as the Eighth Amendment prohibition against excessive fines. Before turning to these challenges, we consider whether section 1437d(l)(5) violates the First Amendment, since it was under this provision that the district court concluded that the statute, as we have concluded it must be interpreted, would be unconstitutional.
 
 
 86
 * According to the district court, the only rational objective served by authorizing the eviction of "innocent tenants" is to discourage household members and guests from using drugs because they know their conduct can lead to the tenant's eviction. In the district court's view, this objective violates the First Amendment guarantee of freedom of association. This conclusion, however, is foreclosed by the Supreme Court's decision in Lyng v. International Union, UAW, 485 U.S. 360 (1988).
 
 
 87
 Lyng involved a freedom of association challenge to a statute providing that no household would become eligible to receive food stamps if any household member were on strike. Although the statute could be seen as an attempt to discourage workers from striking because of the resulting costs that would be imposed upon the entire household, the Supreme Court rejected this argument on the basis that the statute did not "order" individuals not to associate with one another, nor did it "directly and substantially interfering with family living assignments." Id. at 364-65 (quoting Lyng v. Castillo, 477 U.S. 635, 638 (1986)). Similarly here, section 1437d(l)(5) does not order individuals not to associate with one another, nor does it directly and substantially interfere with family living arrangements. Just as it does not violate the Constitution to deny an entire household food stamps on the basis of one member's decision to participate in a strike, it is not unconstitutional to evict an entire household on account of one member's drug use.
 
 
 88
 Our conclusion comports with that of the Fifth Circuit, which has held that evicting a tenant on the basis of his son's drug-related criminal activity does not interfere with constitutionally protected associational rights. See Chavez v. Housing Auth. of El Paso, 973 F.2d 1245, 1247-48 (5th Cir. 1992). Similar constitutional challenges have been rejected by other courts as well. See, e.g., City of South San Francisco Hous. Auth., 41 Cal. App. 4th Supp. at 19-20 (rejecting a tenant's substantive due process challenge to eviction based on drugs found in his son's room where there was no evidence that the tenant knew or had reason to know of his son's illegal conduct). Tenants, quite simply, are not being evicted because of their association with drug users. Instead, OHA is terminating their tenancy because of their failure to comply with a lease provision by which they agreed to abide.
 
 B
 
 89
 We turn then to the right to intimate association under the Fourteenth Amendment. Tenants contend that any statute that imposes an "undue burden" upon a constitutionally protected privacy right is subject to strict scrutiny, see Planned Parenthood v. Casey, 505 U.S. 833, 874 (1992), and that section 1437d(l)(5) unjustifiably burdens Tenants' right to intimate association under the Fourteenth Amendment.
 
 
 90
 Although "the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships," Board of Directors of Rotary Int'l v. Rotary Club, 481 U.S. 537, 544 (1987), OHA's no-fault eviction policy serves the reasonable objective of deterring drug-related criminal activity. Casey, on which Tenants rest their argument, states that "[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Casey, 505 U.S. at 873-84. The purpose of the public housing lease statute is not to burden tenants' intimate association rights, but to promote the weighty governmental interest of providing a safe, drug-free environment for low-income families. Because Tenants have not shown that enforcement of the lease "burdens a fundamental right by `directly and substantially' interfering with family living arrangements," Chavez, 973 F.2d at 1248 (quoting Lyng, 477 U.S. at 638), we conclude that section 1437d(l)(5) does not impose an undue burden and thus does not violate tenants' freedom of intimate association.
 
 C
 
 91
 Tenants raise an excessive fines challenge to section 1437d(l)(5). The Eighth Amendment's Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, `as punishment for some offense.' " Bajakajian, 118 S. Ct. at 2033 (quoting Austin v. United States, 509 U.S. 602, 609-10 (1993) (emphasis deleted)).
 
 
 92
 A punishment is not, however, subject to excessive fines analysis if it is "not cash or in kind payment directly imposed by, and payable, to the government." Kim v. United States, 121 F.3d 1269, 1276 (9th Cir. 1997). In rejecting an excessive fines challenge to a punitive damages award, the Supreme Court explained that "the history of the Eighth Amendment convinces us that the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government." Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 268 (1989) (emphasis added); see also id. at 265 ("[W]e think it significant that at the time of the drafting and ratification of the Amendment, the word `fine' was understood to mean a payment to a sovereign as punishment for some offense." (emphases added)). The Supreme Court has made clear that the Excessive Fines Clause applies only when the government, acting with punitive intent, extracts a payment to itself. See Bajakajian, 118 S. Ct. at 2033 ("Forfeitures -payments in kind -are thus `fines' [subject to Eighth Amendment scrutiny] if they constitute punishment for an offense."); Austin, 509 U.S. at 609-10 ("The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, `as punishment for some offense.' ").
 
 
 93
 The purported "punishment" in the present case -termination of tenancy -is neither a cash nor an in-kind payment imposed by and payable to the government. Accordingly, it is not subject to analysis as an excessive fine. Seeking to overcome this hurdle, Tenants cite cases involving excessive fines challenges to civil forfeitures. Civil forfeitures do involve a payment to the government -in the case of leaseholds, the government assumes the property right in the tenancy (e.g., if the tenant in a private apartment building has paid rent for the year, the federal government acquires the tenant's rights in that apartment for the remainder of the year and can utilize that apartment for the remainder of the year without having to pay additional rent) -and thus may be subject to excessive fines analysis under the Eighth Amendment. See, e.g., United States v. 3814 NW Thurman, 164 F.3d 1191, 1197 (9th Cir. 1999), amended by 172 F.3d 689 (9th Cir. 1999). These civil forfeiture cases are, however, inapposite to the present case because we are not dealing with an attempt by the federal government to seize Tenants' property under the civil forfeiture laws. See supra Part IV-D-2.[25]
 
 VI
 
 94
 Having resolved the APA and constitutional issues, we now turn to Walker's ADA claim. The district court held that, as a result of Walker's disability which renders him incapable of living alone, the burden imposed by 42 U.S.C. S 1437d(l)(5) to ensure that guests do not engage in drug-related criminal activity weighs more heavily on him than on others. While a tenant without Walker's disability can choose not to invite guests over, Walker does not have this option because he requires the constant assistance of a care-giver. The district court held that OHA cannot evict him on the basis of his caregiver's drug-related criminal activity.
 
 
 95
 It is not disputed that OHA must provide reasonable accommodations to disabled tenants. See, e.g. , Green v. Housing Authority, 994 F. Supp. 1253, 1255-56 (D. Or. 1998). The ADA specifically provides that the failure to provide disabled persons with reasonable modifications constitutes discrimination:
 
 
 96
 [Discrimination includes] a failure to make reason able modifications in policies, practices, or proce dures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.
 
 
 97
 42 U.S.C. S 12182(b)(2)(A)(ii). A HUD regulation similarly focuses on the need to provide disabled persons with reasonable accommodation:
 
 
 98
 For all aspects of the lease and grievance proce dures, a handicapped person shall be provided rea sonable accommodation to the extent necessary to provide the handicapped person with an opportunity to use and occupy the dwelling unit equal to a non handicapped person.
 
 
 99
 24 C.F.R. S 966.7(a).
 
 
 100
 Walker needs a care-giver; he does not, however, need a drug-using care-giver. OHA did accommodate Walker by not attempting to terminate his tenancy until after the third time that drugs or drug paraphernalia were found in his apartment. On each occasion, OHA issued Walker a lease violation notice, thus giving him ample notice of the fact that his caregiver was using drugs within his apartment. Facing two strikes, Walker chose to retain his care-giver even though she persisted in using drugs in his apartment.[26] OHA is not required by the ADA to provide Walker with accommodation that is not reasonable, see Memmer v. Marin County Courts, 169 F.3d 630, 633-34 (9th Cir. 1999); Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1048-51 (9th Cir. 1999), and we hold that a request to waive applicability of section 1437d(l)(5) to a tenant's care-giver is not reasonable (at least where it has not been shown that only a care-giver who uses drugs can provide the tenant with "an opportunity to use and occupy the dwelling unit equal to a non-handicapped person"). 24 C.F.R. S 966.7(a).
 
 VII
 
 101
 With no likelihood of success on the merits of their claims, Tenants are not entitled to a preliminary injunction. See Coalition for Economic Equity v. Wilson, 122 F.3d 692, 710-11 (9th Cir. 1997). We accordingly vacate the preliminary injunction and remand to the district court for further proceedings consistent with this opinion.
 
 
 102
 The order granting the preliminary injunction is REVERSED, and the preliminary injunction is VACATED.
 
 
 
 Notes:
 
 
 [1]
 Congress made three other related findings:
 The Congress finds that- . . .
 (3) drug dealers are increasingly imposing a reign of terror on public and other federally assisted low-income housing tenants;
 (4) the increase in drug-related and violent crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial government expenditures;
 (5) local law enforcement authorities often lack the resources to deal with the drug problem in public and other federally assisted low-income housing, particularly in light of the recent reductions in Federal aid to cities . . . .
 Id. S 11901(3)-(5).
 
 
 [2]
 The term "drug-related criminal activity" was defined as "the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use, of a controlled substance (as defined in section 802 of Title 21)." Id. S 1437d(l).
 
 
 [3]
 In 1998, section 1437d(l)(5) was redesignated as subsection (l)(6), but the language was left unchanged. We will continue to refer to this provision as (l)(5).
 
 
 [4]
 Walker consented to this search, as well as to the subsequent searches.
 
 
 [5]
 Rucker also presented an ADA claim, which the district court dismissed because she did not allege a disability. Rucker does not appeal this ruling, so only Walker's ADA claim is before us.
 
 
 [6]
 The unlawful detainer action against Rucker was dismissed in February 1998. Rucker continues to reside in OHA housing.
 
 
 [7]
 In addition, the court specifically enjoined OHA from prosecuting its state court eviction proceedings against Hill, Lee, and Walker.
 
 
 [8]
 Only a handful of other courts have addressed this precise issue, and they have reached conflicting conclusions. Compare City of South San Francisco Hous. Auth. v. Guillory, 41 Cal. App. 4th Supp. 13, 18-19 (Cal. App. Dep't Super. Ct. 1995) (concluding that "drug-related activity by any member of a tenant's household is cause per se for termination of the lease where . . . the housing authority receives federal funds"), with Charlotte Hous. Auth. v. Patterson, 464 S.E.2d 68, 72 (N.C. Ct. App. 1995) ("With no mention of personal fault, the statute and lease at issue in this case provide that criminal activity by a member of a tenant's household is cause for ending a tenancy. However, as noted above, the legislative history reveals a clearly expressed legislative intent that eviction is appropriate only if the tenant is personally at fault for a breach of the lease . . . .").
 
 
 [9]
 The dissent argues that a broad reading of the term "any drug-related criminal activity" is untenable because it leads to "absurd result[s]." Dissenting Op. at 1827. This argument might be more persuasive if not for the fact that other language within section 1437d(l)(5) places limits upon the otherwise expansive scope of "any drug-related criminal activity."
 Although the dissent is correct to point out that the statute does not explicitly state what illegal drug-related activity constitutes cause for eviction, the relevance of such observation to this case is unclear. Any metaphysical ambiguity in the statutory language has no bearing on the task at hand: determining whether HUD's regulations constitute a permissible interpretation of section 1437d(l)(5).
 
 
 [10]
 Congress recently reaffirmed its desire to leave discretion in the hands of PHAs when it enacted 42 U.S.C. S 13662. Like section 1437d(l)(5), section 13662 requires PHAs to include a lease provision that allows the PHA to terminate the tenancy of any household with a member whose drug use threatens the health or safety of others, but explicitly makes clear that a PHA may consider other factors in deciding whether actually to evict on this basis. See 42 U.S.C. S 13662.
 
 
 [11]
 Under section 1437d(l)(5) and the applicable HUD regulations, eviction of a household is not the only possible response to cases involving
 drug-related criminal activity; PHAs have the discretion to utilize a wide range of alternative remedies in such cases. In challenging HUD's interpretation of the statute, the dissent places significant emphasis upon the existence of such remedies. See Dissenting Op. at 1828. That alternative remedies are available does not mean, of course, that they are the only options open to PHAs under the statute.
 
 
 [12]
 The statute reads in relevant part:
 (4) [T]he public housing agency shall comply with such pro -
 cedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to --
 (A) . . . the establishment of tenant selection criteria which--
 (iii) prohibit any individual or family evicted from housing assisted under the chapter by reason of drug-related crimi nal activity from having a preference under any provision of this subparagraph for 3 years unless the evicted tenant suc cessfully completes a rehabilitation program approved by the agency, except that the agency may waive the application of this clause under standards established by the Secretary (which shall include waiver for any member of a family of an individual prohibited from tenancy under this clause who the agency determines clearly did not participate in and had no knowledge of such criminal activity or when circumstances leading to eviction no longer exist).
 (emphasis added). Thus the waiver would be utterly irrelevant to someone who had never lived in nor been evicted from public housing. As a matter of simple logic, one must be a tenant of public housing before one can be evicted from public housing for drug-related activity. In other words, the scope of the waiver of the prohibition period cannot be any broader than the scope of the prohibition itself.
 
 
 [13]
 With respect, the dissent's reading of section 1437d(c)(4)(A)(iii) does not make sense. The dissent essentially argues that the statutory waiver applies to applicants for public housing regardless of whether such applicants had ever been evicted from such housing. What the dissent overlooks is that only an "individual or family evicted from [public] housing by reason of drug-related criminal activity" would ever need a waiver, because only such evicted former tenants would be subject to the threeyear prohibition period in the first place. 42 U.S.C. S 1437d(c)(4)(A)(iii)
 
 
 [14]
 Section 881(a)(7) provides:
 The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 (7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter pun ishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission estab lished by that owner to have been committed or omitted without the knowledge or consent of that owner.
 Id.
 
 
 [15]
 The dissent argues that "Congress must have meant [section 1437d(l)(5) and amended section 881(a)(7)] -passed as part of the same chapter of the same Act -to be interpreted consistently." Dissenting Op. at 1833. But the dissent's recommended course of action -giving these two provisions the same meaning, despite their clearly different language -is surely no recipe for consistent interpretation. Cf. Dissenting Op. at 1838 ("The fact that Congress chose to use different language in similar situations tends to show it intended a different meaning.")
 
 
 [16]
 Forfeiture proceedings involve suits by the federal government against the property. See, e.g., United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres, 904 F.2d 487, 490 (9th Cir. 1990).
 
 
 [17]
 Although eviction under California law has been denominated a "summary proceeding," Dissenting Op. at 1835 n.4, a landlord seeking to evict a tenant still has to prove the existence of a ground for eviction by a preponderance of the evidence. See Western Land Office, Inc. v. Cervantes, 220 Cal. Rptr. 784, 797-98 & 797 n.10 (Ct. App. 1985).
 
 
 [18]
 At times the dissent appears to argue that the anti-forfeiture provision of section 881(a)(7), in addition to reflecting certain general constitutional concerns, applies directly to the termination of tenancies as authorized under section 1437d(l)(5). See Dissenting Op. at 1834-35. If this is in fact the dissent's argument, it is untenable, because the anti-forfeiture provision by its terms governs only forfeitures made "under this paragraph," i.e., forfeitures to the federal government pursuant to section 881(a)(7).
 
 
 [19]
 In 1998, this provision was recodified as section 1437d(l)(2). As do the parties, we will continue to refer to this subsection as (l)(1).
 
 
 [20]
 That Congress viewed drug-related criminal activity as especially pernicious is evidenced by the fact that, with respect to non-drug-related criminal activity, only that which "threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants " is cause for termination of tenancy, whereas this limiting provision does not apply to drugrelated criminal activity, which is per se cause for eviction. See 42 U.S.C. S 1437d(l)(5).
 
 
 [21]
 This would be so even if the knowledge factor were incorporated as an affirmative defense with the burden of proof on the tenant to show his "innocence."
 
 
 [22]
 A Minnesota statute provides that: "In every lease or license of residential premises, whether in writing or parol, the lessor or licensor and the lessee or licensee covenant that . . . neither will . . . unlawfully allow controlled substances in those premises or in the common area and curtilage of the premises." Minn. Stat. S 504.181, subd. 1. In Minnesota, a tenant is liable for activities that breach the lease even if the tenant did not participate in or control the conduct. See Phillips Neighborhood Hous. Trust, 564 N.W.2d at 575.
 
 
 [23]
 We realize, as does the dissent, that section 13662 was not in existence when this lawsuit was commenced. Nevertheless, the policy decisions reflected in that provision shed light upon the reasonableness of HUD's interpretation of section 1437d(l)(5).
 
 
 [24]
 The scattered case law on point generally supports our conclusion. See Green, 657 So.2d at 555; cf. Coleman v. City of Yonkers Mun. Hous. Auth., 679 N.Y.S.2d 624, 624-25 (N.Y. App. Div. 1998) (affirming eviction of tenant on the basis of son's actions); City of South San Francisco Hous. Auth., 41 Cal. App. 4th Supp. at 16-20. But see Richmond Tenants Org. v. Richmond Redevelopment & Hous. Auth., 751 F. Supp. 1204, 1206 (E.D. Va. 1990) (concluding that it is unreasonable to evict a tenant for any conduct that occurs off-premises).
 
 
 [25]
 The dissent appears to view our rejection of Tenants' excessive fines challenge as based upon a belief that the Excessive Fines Clause does not apply to the states. We need not, and do not, express any view on such issue. As previously discussed, an eviction from public housing based upon breach of a lease provision relating to drug-related criminal activity simply does not implicate civil forfeiture laws, be they state or federal in origin.
 Treating an eviction authorized by section 1437d(l)(5) as a forfeiture, the dissent expresses its view that HUD's regulations, insofar as they permit eviction of "innocent tenants," may violate the Fourteenth Amendment's Due Process Clause. Even assuming that such an eviction could be treated as a forfeiture, we cannot agree. The dissent relies most heavily upon the concurring opinions of Justice Thomas and Justice Ginsburg in Bennis v. Michigan, 516 U.S. 442 (1996). While these opinions are quite interesting, the opinion of the Court -which both Justice Thomas and Justice Ginsburg joined in full -controls.
 The Bennis Court upheld, as consistent with due process, the forfeiture of Bennis's entire interest in a car that she co-owned with her husband -even though she had no knowledge that he would use the car to engage in illegal sexual activity with a prostitute. In rejecting Bennis's "innocent owner" defense, the Court made clear that "a long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use." Id. at 446. Bennis simply cannot support the dissent's analysis.
 
 
 [26]
 Walker did fire his care-giver after the issuance of the third lease violation, but has not offered any reason why he did not take this step earlier.
 
 
 W. FLETCHER, Circuit Judge, dissenting:
 
 103
 This case involves the attempted eviction of four tenants and their families from public housing in Oakland, California. Appellee Pearlie Rucker is a 63 year-old woman who has lived in public housing for 13 years. She currently lives with her mentally disabled daughter, her two grandchildren, and her great-grandchild. Appellants assert as a ground for her eviction that Ms. Rucker's mentally disabled daughter possessed cocaine three blocks from her apartment. Ms. Rucker regularly searches her daughter's room for evidence of drug activity and has warned her and others that drug activity in the apartment could result in their eviction. Appellee Willie Lee is a 71 year-old man who has lived in Oakland public housing for 25 years. He currently lives with his grandson. Appellants assert as a ground for his eviction that Mr. Lee's grandson possessed marijuana in a parking lot of the housing complex. Appellants do not allege that Mr. Lee had any knowledge of his grandson's marijuana possession. Appellee Barbara Hill is a 63 year-old woman who has lived in the same public housing apartment for 30 years. Like Mr. Lee, she currently lives with her grandson. Appellants assert as a ground for her eviction that her grandson possessed marijuana in the parking lot of the housing complex. Appellants do not allege that Ms. Hill had any knowledge of her grandson's marijuana possession.
 
 
 104
 Appellee Herman Walker is a disabled 75 year-old man who has lived in "senior" public housing for eight years. He is not capable of living independently and requires an inhome caregiver. Appellants assert as a ground for Mr. Walker's eviction that his caregiver and his caregiver's guests possessed cocaine and drug paraphernalia in his apartment. Appellants do not allege that Mr. Walker himself engaged in drug-related activity.
 
 
 105
 Appellants contend that 42 U.S.C. S 1437d(l)(5), part of the National Housing Act, authorizes eviction of public housing tenants and their families if any member of the household engages in any drug-related criminal activity (including possession of marijuana) on or near the public housing premises, whether or not the tenant had any knowledge of, or ability to control, that activity. Under appellants' construction of the statute, a parent who disapproves of drugs and diligently tries to keep her children off drugs, but who has an adolescent child who experiments with marijuana, is subject to eviction. Needless to say, this law, as construed by appellants, is not the standard under which American families are permitted to remain in private homes. If families were permitted to remain in their private homes only on condition that no family member had ever used or possessed illegal drugs in or near the home, many American families would be made homeless.
 
 
 106
 The district court preliminarily enjoined the evictions as not authorized under 42 U.S.C. S 1437d(l)(5), and the majority reverses. Because I believe that the majority misconstrues the applicable law, I respectfully dissent.
 
 Discussion
 
 107
 I will first discuss the attempted eviction of appellees Ms. Rucker, Mr. Lee, and Ms. Hill. I will then discuss the attempted eviction of appellee Mr. Walker, whose case presents an additional issue concerning the Americans with Disabilities Act.
 
 
 108
 I. Eviction of Appellees Ms. Rucker, Mr. Lee, and Ms. Hill
 
 
 109
 The central issue in this case is whether tenants without knowledge of, or ability to control, off-premises drug-related activity of household members may be evicted from public housing. If appellants had sought only to evict the household member engaged in drug-related activity, we would not be here today. However, appellants seek to evict not only the offending member of the household, but also the innocent head-of-household and other innocent family members.
 
 A. The Lease Provision
 
 110
 The directly governing statutory provision in this case was originally passed as part of the Anti-Drug Abuse Act of 1988, Public Law 100-690, 102 Stat. 4300, now amended and codified at 42 U.S.C. S 1437(d)(l). In its current form, it provides, in relevant part:
 
 
 111
 Each public housing agency shall utilize leases which --
 
 
 112
 (1) do not contain unreasonable terms and condi tions; [and]
 
 
 113
 ***
 
 
 114
 (5) provide that any criminal activity that threat ens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or near such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termi nation of tenancy[.]
 
 1. Plain Meaning of the Statute
 
 115
 The district court found that the express language of the lease provision is silent as to the treatment of "innocent tenants." An examination of the text of the statute and the arguments of the parties reveals that the district court was correct.
 
 
 116
 Appellant HUD argues, and the majority agrees, that Congress meant to provide for the eviction of innocent tenants because the language "any drug-related criminal activity on or near such premises . . . shall be cause for termination of tenancy" (emphasis added) means that no one, even an innocent tenant, is excluded. The majority thus equates Congress' silence as to whether a tenant is required to know about, or be able to control, the drug-related criminal activity with Congress' specific intent that the statute be applied to innocent tenants.
 
 
 117
 The majority reaches its conclusion by construing "any drug-related criminal activity" to mean "all " such activity without limitation. But such an all-encompassing reading leads to absurd results. If "any" truly means "all," without limitation, Congress must also have specifically intended that the drug-related criminal activity could occur at any time and still be cause for termination of the lease, since the statute is silent as to when the drug-related criminal activity must occur. In other words, such a reading leads to the conclusion that Congress specifically intended that if a family member engaged in drug-related activity five years ago, or if the tenant invites a guest into her apartment and the guest engaged in such activity five years ago, the drug-related criminal activity of the family member or guest would be cause for termination, regardless of whether the tenant had any knowledge of that activity.
 
 
 118
 Congress could not have intended such an absurd result. See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka, & SF Ry. Co., 520 U.S. 510, 516 (1997). Contrary to the reading adopted by the majority, the only reasonable interpretation of the statute is that Congress did not mean "any " in the most all-encompassing sense possible. See Lewis v. United States, 523 U.S. 155, , 118 S.Ct. 1135, 1139 (1998) (an allencompassing reading ofthe words "any enactment " "is not a sensible interpretation of this language [since such a reading] would dramatically separate the statute from its intended purpose."). HUD itself has rejected an all-encompassing interpretation of the word "any." In adopting its regulation implementing S 1437d(l)(5), HUD limited the words "any drugrelated criminal activity" to mean any such activity taking place at the time a wrong-doer is a guest, 56 Fed. Reg. 51562 (1991), even though HUD does not contend this limitation to "any" is in the statute. While HUD's reading of when "any" activity must take place is the only reasonable construction of the statute, it is contrary to the "plain meaning " of that same statute as found by the majority.
 
 
 119
 Moreover, no matter how broadly "any" is read, the statute is ambiguous as to whose tenancy may be terminated. Section 1437d(l)(5) allows for "termination of tenancy " but does not explain whether such termination applies to the tenancies of all members of the household or only to the tenancy of the tenant engaged in the drug-related criminal activity. As I read the statute, Congress contemplated that a termination under this section might be applied only to a tenant engaged in drugrelated activity, or to a tenant in a position to know about and control such activity. In support of this reading, I note, for example, that S 1437d(n) specifically provides for notification of the local post office when "a public housing agency evicts an individual or family from a dwelling unit for engaging in criminal activity, including drug-related criminal activity[.]" (emphasis added). Congress thus foresaw cases where only an individual, rather than an entire family, would be evicted, and the district court did not err in finding that the plain language of the statute did not necessarily require the eviction of innocent tenants.
 
 
 120
 The district court concluded that any lease term must be reasonable under 42 U.S.C. S 1437d(l)(1). There is nothing remarkable about the court's conclusion since the actual language of 42 U.S.C. S 1437d(l)(1) provides:
 
 
 121
 Each public housing agency shall utilize leases which--
 
 
 122
 (1) do not contain unreasonable terms and con ditions;
 
 
 123
 Since all the subparagraphs specifying lease requirements under S 1437d(l) are joined with the connector "and" rather than "or," any construction of subparagraph (5) of S 1437d(l) must also be "reasonable" under subparagraph (1) of that same section. The majority contends that if there is some conflict between their construction of subparagraph (5) and the reasonableness requirement of (1), subparagraph (5), the more specific, controls over subparagraph (1), the more general. I believe that this is a method for reading the reasonableness requirement out of the statute rather than for reading the two provisions consistently. Where a construction can eliminate potential conflict between the two sections, that construction must prevail. Helen & Associates, Inc. v. Phoenix Resort Corp., 958 F.2d 295, 297 (9th Cir. 1992).
 
 
 124
 The majority contends that appellants' construction is reasonable because giving protection to innocent tenants would "hamstring" efforts to fight drugs in public housing. In so concluding, the majority relies on facts that are not in the record. The district court found, on the record before it, that the evidence showed that eviction of persons who did not know, could not foresee, and could not control the conduct of others does nothing to further the battle against drugs in public housing. By contrast, where the district court did find that a tenant could do something to assure drug activity would not occur, the court did not extend injunctive relief to protect such a tenant (even if she was not personally involved in the drugrelated activity).[1]
 
 
 125
 The majority further contends that evicting innocent tenants is reasonable because barring innocence as a defense holds down litigation costs. There are many ways to hold down litigation costs, not all of them reasonable or appropriate. I am confident that the majority does not believe that a public housing authority should be allowed to skip the eviction process altogether and just change the locks. Nor should it believe that it is reasonable to punish the innocent along with the guilty because it is cheaper to litigate under that standard than under a standard that protects the innocent.
 
 
 126
 Finally, the majority compares eviction from public housing to eviction from private rental property. I find this comparison unhelpful. Suffice it to say that good cause is always required for eviction from public housing, 42 U.S.C. S 1437d(l)(4), whereas, absent such a provision in the lease, a similar requirement of good cause is generally not required in private residential leases. See, e.g., S.P. Growers Ass'n v. Rodriguez, 17 Cal.3d 719, 730 (1976).
 
 2. Legislative History
 
 127
 Since the plain language of the lease provision does not compel either party's interpretation, this court may properly look at legislative history to determine Congress' intent. I believe that the legislative history supports the tenants' interpretation.
 
 
 128
 The original version of 42 U.S.C. S 1437d(l)(5) was enacted as part of the Anti-Drug Abuse Act of 1988. No House or Senate Reports accompanied this legislation, and none of the committee reports had anything to do with the provisions affecting HUD. However, in 1990, Congress revisited termination of tenancy for drug-related activity and effectively rewrote subparagraph (l)(5) into its present form. Public Law 101-625. The legislative history indicates that Congress did not intend for innocent family members to be evicted. The Senate Report[2] specifically stated that eviction would not be appropriate "if the tenant had no knowledge of the criminal activities of his/her guests or had taken reasonable steps under the circumstances to prevent the activity." 1990 USCCAN 5941. Likewise, the Conference Report said of an identical passage in the Section 8 housing assistance program: "[T]he Committee assumes that if the tenant had no knowledge of the criminal activity or took reasonable steps to prevent it, then good cause to evict the innocent family members would not exist." Id. at 5889.
 
 
 129
 It is well established in this circuit that "the official committee reports provide the authoritative expression of legislative intent" when examining legislative history. 3 See In re Kelly, 841 F.2d 908, 912 n.[3] (9th Cir. 1988). The majority opinion attemptsto explain these comments as evidence that Congress granted HUD and the public housing authorities (PHAs) discretion not to evict in these situations. However, Congress did not appeal only to the PHAs; it appealed to the "wise exercise of the humane judgment by the PHA and the eviction court." 1990 USCCAN 5941 (emphasis added). If Congress had meant to leave the discretion solely with the PHAs, the judgment of the courts would never come into play. Further, the Committee Reports were very clear that these evictions "would not" be appropriate, not that they might not. Id. Congress thus left no room for the unchallengeable discretion the majority would grant the government.
 
 B. The Anti-Forfeiture Provision
 
 130
 In the Anti-Drug Abuse Act of 1988, Congress both passed the original version of the lease provision (just discussed), which amended the National Housing Act, and amended a pre-existing anti-forfeiture provision of the Controlled Substances Act. Both the lease provision and the amendment to the anti-forfeiture provision were part of Chapter 1 of Subtitle C of Public Law 100-690 (Preventing Drug Abuse in Public Housing). The anti-forfeiture provision was amended by inserting the phrase "(including any leasehold interest)" into the text of the pre-existing statute. As a result of the amendment, the Controlled Substances Act now provides, in relevant part:
 
 
 131
 (a) Subject property
 
 
 132
 The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 
 
 133
 * * *
 
 
 134
 (7) All real property, including any right, title, and interest (including any leasehold interest ) in the whole of any lot or tract of land and any appurte nances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this sub chapter punishable by more than one year's impris onment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission estab lished by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 135
 21 U.S.C. S 881(a) (emphasis added: italics indicate material added in 1988; underlined text was already in the statute).
 
 
 136
 We are faced with a more specific task than merely understanding the lease provision of the National Housing Act and the anti-forfeiture provision of the Controlled Substances Act. We must understand, and make consistent, section 5101 (the lease provision) and section 5105 (the amendment to the antiforfeiture provision) of Public Law 100-690, which amended these two Acts. It is axiomatic that Congress must have meant these provisions -passed as part of the same chapter of the same Act -to be interpreted consistently. Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995). The majority argues that the amendment of the anti-forfeiture provision simultaneously with the enactment of the lease provision supports its position. It concludes that Congress (implicitly) intended to deprive innocent tenants of protection under section 5101 of PL 100-690 at the same time it (expressly) intended to protect tenants who had no "knowledge " of, and had not given any "consent" to, drug-related activity under section 5105 of that same law.
 
 
 137
 In order to conclude that Congress intended the forfeiture of the leasehold interest of an innocent tenant, the majority distinguishes between forfeiture to the federal government and forfeiture to a local government agency. The majority is correct in pointing out that the anti-forfeiture provision deals with forfeitures to the federal government and that the lease provision deals with forfeitures to local housing authorities. The majority recognizes that there "may be a constitutional bar to forfeitureof property when the property owner is uninvolved and unaware of the wrongful activity," ante at 642, and it argues that the explicit incorporation of that bar into the anti-forfeiture provision alleviates that constitutional concern when forfeitures to the United States are at issue. But the majority assumes that Congress' awareness of, and intent to alleviate, that same concern somehow disappeared when forfeitures to a public housing authority were at issue. I disagree. To the extent that a reading of a forfeiture statute is driven by a concern to avoid an unconstitutional construction, that concern should be equally present whether the forfeiture is to the federal government or to a local governmental authority.
 
 
 138
 The majority distinguishes between forfeitures to the federal government and forfeitures to local authorities based on a hypothesized congressional conclusion that tenants need more protection from the federal government because of the federal government's temptation to enrich itself through forfeiture proceedings. This hypothesis is unsupported by the text, context, or history of the legislation, and I view it as an inappropriate attribution to Congress of a base view of the motivations of federal authorities in forfeiture cases.
 
 
 139
 The majority further argues that a forfeiture proceeding -whether conducted by the federal government or by a local housing authority -is sufficiently different from an eviction proceeding that the anti-forfeiture provision should in any event not apply to evictions. The most obvious problem with the majority's argument is that leasehold interests are typically terminated by eviction, and that the 1988 Act specifically added "leasehold interests" to the anti-forfeiture provision. See, e.g., United States v. The Leasehold Interest in 121 Nostrand Ave., 760 F.Supp. 1015 (E.D.N.Y. 1991) (applying the anti-forfeiture provision, 21 U.S.C.S 881(a), to forfeiture of a leasehold).
 
 
 140
 The majority argues, finally, that a forfeiture under the statute is available on a lower standard of proof than an ordinary eviction, and that an eviction is therefore not included in the anti-forfeiture provision. But what is at issue in this case is not the burden of proof but the substantive liability of a person who did not and could not know of the criminal activity of another. For purposes of determining whether the statute allows eviction of a person concededly without knowledge, the burden of proof for demonstrating knowledge is not relevant.[4]
 
 
 141
 I am unwilling to assume that the constitutional concerns that appear to have motivated Congress when considering forfeiture to the federal government were irrelevant to Congress when considering forfeiture to local governments. Congress made its intent explicit as to the federal government by adding four words to a pre-existing drug-related forfeiture statute applicable to the federal government. There was (and is) no comparable federal drug-related forfeiture statute applicable to local governments that Congress could have amended with comparable ease; indeed, there may even be some question about the scope of Congress' constitutional power to enact such a general statute. It is therefore not surprising that Congress did not put into the Drug Control Act of 1988 an explicit anti-forfeiture provision applicable to local governments. But the absence of such a provision in the Act does not mean that Congress had no concern about the constitutionality of forfeitures of the leaseholds of innocent tenants to local governments. And it certainly does not mean that Congress intended that the lease provision enacted as part of the same Act should be construed to allow forfeitures to local governments that it explicitly forbade to the federal government.
 
 C. Language in Related Statutory Provisions
 
 142
 1. Waiver of Disqualification Period for Preferences
 
 
 143
 The majority points to an earlier version of 42 U.S.C. S 1437d(c)(4)(A)(iii) in support of its reading of S 1437d(l).[5] The version of the statute that existed until 1996 -and upon which the majority relies -provided for a three-year disqualification period for "preferences" that would otherwise be available to those applying for tenancy in public housing. Preferences were given, for example, to the homeless, to those paying more than 50% of their income in rent, and to those who had recently been displaced from housing. See, e.g., S 1437d(c)(4)(A)(i). The three-year disqualification for such preferences period applied to "any individual or family" evicted from public housing "by reason of drug-related activity."[6] However, the statute specifically required that there be a waiver of the disqualification period for "any member of a family of an individual prohibited from tenancy under this clause who the agency clearly determines did not participate in and had no knowledge of such criminal activity[.]"
 
 
 144
 The majority contends that the statutory waiver to an innocent family member must mean that such a family member could have been evicted in the first place, for otherwise that innocent family member would not be re-applying for public housing. According to the majority, "If an `innocent tenant' could not have been evicted in the first place, there would have been no need for Congress to write a statute specifically waiving the three-year waiting period for them." The majority has read into the statute a limiting concept that was not there. The statute nowhere used the word "re-apply" or its equivalent. Rather, the statute gave its preferences to all those applying -not merely those re-applying -for public housing; and it similarly imposed its three-year disqualification for preferences on all those applying -not merely those reapplying -for public housing.
 
 
 145
 Once one understands that the statute covered anyone applying for public housing, the statute made perfect sense. The waiver provision of the statute ensured that applicants for public housing who were entitled to preference did not lose that preference because of the sins of a family member. So long as the applicants had not participated in and had had no knowledge of the drug-related activities of their family member, they were not subject to the three-year disqualification period. Far from supporting the majority's argument, the statute showed Congress' concern that innocent applicants for public housing not suffer because of their family member's drug-related activities.
 
 2. The Veterans Affairs Act of 1999
 
 146
 The majority also relies on S 577 of the Veterans Affairs Act of 1999 (codified at 42 U.S.C. S 13662) for its view that Congress plainly meant to evict innocent tenants. The Act was not in effect at the time the case was argued to us, was never presented to the district court, and has major textual interpretation issues of its own. I do not believe that we should be analyzing this statute at this stage of the litigation, in part because of the obvious hazards inherent in attempting to resolve complexquestions of statutory interpretation under a statute that has not been the focus of the parties or the district court, and in part because appellants have not sought to use this statute to evict the tenants in this case. Under the circumstances, I will simply point out that the language of S 577 of the Veterans Affairs Act is different from that of the lease provision of the National Housing Act, and that there is no indication that Congress intended these two provisions to have the same interpretation. The fact that Congress chose to use different language in similar situations tends to show it intended a different meaning. See Florida Telecommunications Ass'n v. FCC, 54 F.3d 857, 860 (D.C. Cir. 1995). I do not read S 577 as supporting the wholesale eviction of innocent tenants, for it addresses households with a member who is a drug user, rather than on households with a member engaged in unspecified and off-premises drug-related activity, and it addresses rehabilitation of the offending member. Further, and in any event, "the views of a subsequent Congress form a hazardous basis for inferring intent of an earlier one." South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 355 (1998).
 
 
 147
 D. Avoiding Substantial Constitutional Questions
 
 
 148
 A statute that can be construed to avoid substantial constitutional questions should be so construed. United States v. X-Citement Video, Inc., 513 U.S. 64, 78 (1994). The construction adopted by the majority raises substantial constitutional questions both under the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. Since the statute is clearly capable of a construction that will avoid these questions, I believe we should adopt that construction.
 
 1. Excessive Fines
 
 149
 The Excessive Fines Clause provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const., amend. 8 (emphasis added). Relying on Kim v. United States, 121 F.3d 1269, 1276 (9th Cir. 1997), the majority contends that the forfeiture of a leasehold interest is not subject to the clause because it only applies to " `cash or in kind payment directly imposed by, and payable to, the government.' " Ante at 648. However, Kim holds only that an administrative disqualification is not subject to the Excessive Fines Clause. It does not hold that a forfeiture of a property interest is not subject to the clause. Indeed, Austin v. United States, 509 U.S. 602 (1993), on which Kim relies, 121 F.3d at 1276, is directly to the contrary, holding squarely that forfeiture of property is covered by the Excessive Fines Clause, 509 U.S. at 622.[7]
 
 
 150
 The majority further contends that the Excessive Fines Clause is inapplicable "because we are not dealing with an attempt by the federal government to seize Tenants' property under the civil forfeiture laws." Ante at 649, referring to its earlier discussion of the anti-forfeiture provision, 21 U.S.C. S 881(a). It is, of course, true that the forfeiture in this case is sought by a local government rather than the federal government, but it is a forfeiture nonetheless. Although the question is not entirely settled, it is very likely that the Excessive Fines Clause applies to the states. As Justice O'Connor wrote in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 282, 284 (1989) (O'Connor, J., concurring), "[T]he Cruel and Unusual Punishments Clause [of the EighthAmendment] has been regularly applied to the States. . . . In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States. . . . I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States." The majority does not argue that Justice O'Connor is wrong about the incorporation of the Excessive
 
 
 151
 Fines Clause through the Fourteenth Amendment. Indeed, it does not discuss the incorporation issue and Justice O'Connor's opinion at all. But if the majority were to engage in such a discussion, it would have to concede, at the very least, that the incorporation of the Excessive Fines Clause and the application of the Clause to the forfeiture of appellees' leasehold to a local government pose substantial constitutional questions.
 
 2. Due Process
 
 152
 The forfeiture of a tenant's leasehold interest under the circumstances presented in this case also raises substantial questions under the Due Process Clause. It is undisputed that tenants of public housing have a property interest in their tenancy. See Geneva Towers Tenants Org. v. Federated Mortgage Inv., 504 F.2d 483, 488-89 (9th Cir. 1974). The holding of the Supreme Court in Bennis v. Michigan, 516 U.S. 442 (1996), and the discussion in the concurring opinions of Justices Thomas and Ginsburg in that case, strongly suggest that forfeiture of property violates due process if the property has not been used in the commission of the illegal activity in question, and if the owner of the property did not know about, could not foresee, and could not control that activity.
 
 
 153
 In Bennis, a man was arrested for sexual activity with a prostitute in a car co-owned with his wife, and the car was forfeited as a public nuisance. His wife brought suit for the value of her ownership interest in the forfeited car. In a 5-4 decision, the Court held that an innocent owner is subject to forfeiture of her property "by reason of the use to which the property was put even though the owner did not know that it was to be put to such use." Id. at 446. Justice Thomas, the fifth vote for the majority, wrote a separate concurring opinion in which he expressed a belief that the result in Bennis was ordained by centuries of forfeiture law.[8] However, Justice Thomas also expressed a grave concern that forfeiture not be extended beyond cases where the property itself is used for a crime. Id. at 456 (Thomas, J., concurring); see also id. at 458 (Ginsburg, J., concurring) (the government "has not embarked on an experiment to punish innocent third parties. .. . Nor do we condone any such experiment.")
 
 
 154
 In the present case, the majority allows forfeiture of the leasehold of innocent tenants for drug-related activity that did not involve the use of the leasehold property and of which the tenants were unaware. This forfeiture thus deprives innocent people of property that was not involved in any crime and punishes innocent people for crimes that they did not commit and could not prevent.[9] I believe that under Bennis this is likely a violation of the Due Process Clause.
 
 II. Eviction of Mr. Walker
 
 155
 Mr. Walker's case contains an element not present in the cases of Ms. Rucker,Mr. Lee, and Ms. Hill. He contends that the Americans with Disabilities Act ("ADA"), 42 U.S.C. S 12101, et seq., protects him from eviction despite the use of drugs in his apartment by his caretaker and his caretaker's guests. As the majority opinion correctly observes, Mr. Walker unquestionably has a right under the ADA to a live-in caretaker, but he does not have a right under the ADA to have a live-in caretaker who violates the drug laws. If deciding the case de novo on the current record, I might conclude that Mr. Walker had both knowledge of his caretaker's activities and the ability to replace the caretaker. However, this court is not at liberty independently to reweigh the evidence presented to the district court. The district court's findings of fact must be reviewed under the clearly erroneous standard. Roe v. Anderson, 134 F.3d at 1400, 1402 n.1 (9th Cir. 1997). Although Mr. Walker clearly had knowledge of his live-in caretaker's drug-related activity after she was initially found to be keeping drugs and drug paraphernalia on the premises, the district court could reasonably have believed that Mr. Walker was, because of his disability, powerless to stop her or find a replacement any sooner than he did.
 
 
 156
 Mr. Walker claims that his disability prevented him from complying with the anti-drug policy without a reasonable accommodation. The evidence about the extent of Mr. Walker's disability and the degree to which it prevented him from complying with the anti-drug policy is disputed, with both sides presenting conflicting declarations. The majority ignores this dispute and simply adopts appellants' version of the facts as it own. Appellants may be able to establish their version of the facts at trial, but on the record now before us the district court did not abuse its discretion in finding that Mr. Walker's claim was sustainable.
 
 
 157
 Accepting for present purposes that Mr. Walker may have been prevented from complying with the anti-drug policy by his disability, the question then becomes whether a reasonable accommodation can be made that will bring Mr. Walker into compliance with his lease agreement. Appellants maintain that a blanket waiver of the anti-drug policy is not a reasonable accommodation. I agree. The district court's order, however, does not require such a waiver. Rather, the district court specifically rejected appellants' claim that a blanket waiver was the only possible accommodation, and held that, based on the complaint, Mr. Walker may be able to show that another accommodation is reasonable. While the district court may ultimately decide in favor of appellants once the record is developed further, the district court did not abuse its discretion by finding that, on the record before it, Mr. Walker had a fair chance of sustaining his claim under the ADA.
 
 Conclusion
 
 158
 For the foregoing reasons, I respectfully dissent from the majority's construction of this statute.
 
 
 
 Notes:
 
 
 [1]
 For example, the court refused to extend protection of innocent tenants to situations where drug activity occurred in the apartment. "A tenant may control what occurs in her unit by ensuring that no one is present when she is not and searching her apartment and perhaps, her guests and household before they enter. In other words, terminating the lease of a tenant for her failure to maintain a drug-free environment in her apartment holds the tenant responsible for something over which she has some control. Eviction under such circumstances appears rationally related to a legitimate public housing goal." Only where a tenant has no ability at all to prevent the drug-related criminal activity did the district court find that the tenant's eviction is unreasonable.
 
 
 [2]
 The Senate version of this amendment was adopted in the final statute. 1990 USCCAN 6123.
 
 
 [3]
 In an attempt to show a contrary intent, HUD has only quoted isolated statements from witnesses and legislators rather than committee reports. Such statements "cannot be attributed to the full body that voted on the bill." See In re Kelly at 912 n.3. Further, even taken at face value, these statements only go to the problem of drugs, a problem all parties as well as the district court acknowledge as serious, not to the question of whether innocent tenants should be evicted.
 
 
 [4]
 A related misapprehension in the majority opinion is that innocent tenants need more protection in a forfeiture action but less in an eviction action because forfeiture is a summary proceeding. First, as noted above, the nature of the proceeding has nothing to do with the substantive defenses available. Second, under California law eviction is itself a summary proceeding. Nork v. Pacific Coast Medical Enterprises, 73 Cal.App.3d 410, 413 (1977).
 
 
 [5]
 The statutory language relied upon by the majority was superceded in 1996. The majority's argument is not available under the language of the current statute.
 
 
 [6]
 The statutory reference to an "individual or family" evicted for drugrelated activity does not imply that innocent family members could be evicted. An entire family could be evicted if all the members of the family either themselves engaged in drug-related activity, or knew about and failed to control drug-related activity.
 
 
 [7]
 Austin also suggests that a determination of whether a forfeiture violates the Excessive Fines Clause depends on the facts of the case. Austin at 622. Even if this court did need to reach the issue of whether HUD's application of its regulation to appellees violated the Excessive Fines Clause, the proper procedure would be to remand to the district court for such a determination. See id. at 622-23.
 
 
 [8]
 See also Austin at 615 for an examination of the principles underlying forfeiture. The theories supporting the forfeiture of an innocent person's property are limited to situations where the property to be forfeited was itself misused or where "the owner has been negligent in allowing his property to be misused and that he is properly punished for that negligence." Id.
 
 
 [9]
 The district court refused to extend the injunctive relief to situations where the property to be forfeited, the leasehold interest, is directly involved in the drug-related criminal activity. That is, if drugs are found in the apartment, the leasehold is forfeited, regardless of the actual knowledge of the tenants.